BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
ARUN G. RAO
Deputy Assistant Attorney General
AMANDA N. LISKAMM
Director, Consumer Protection Branch
RACHAEL L. DOUD
Assistant Director
ZACHARY L. COWAN (NCBN 53432)
Trial Attorney
    U.S. Department of Justice
    Consumer Protection Branch
    450 5th Street NW, Suite 6400-S
    Washington, DC 20530
    Telephone: (202) 353-7728
    Zachary.L.Cowan@usdoj.gov

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
MICHELLE LO (NYRN 4325163)
Chief, Civil Division
Kenneth W. Brakebill (CABN 196696)
Assistant United States Attorney
    Northern District of California
    450 Golden Gate Avenue
    San Francisco, California 94102
    Telephone: (415) 436-7167
    Kenneth.Brakebill@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br><br>Plaintiff,<br><br>v.<br><br>**VICEROY MEDIA SOLUTIONS, LLC**, also d/b/a quick-jobs.com and localjobsindex.com, a California limited liability corporation;<br><br>**VOLTRON INTERACTIVE, LLC**, a Delaware limited liability corporation;<br><br>**SUNIL KANDA**, individually and as an owner of VICEROY MEDIA SOLUTIONS, LLC and VOLTRON INTERACTIVE, LLC; and<br><br>**QUYNH TRAN**, a/k/a/ Kayli Tran, individually and as an owner of VICEROY MEDIA SOLUTIONS, LLC and VOLTRON INTERACTIVE, LLC,<br><br>Defendants. | Case No. 3:23-cv-3516<br><br>**COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION, AND OTHER RELIEF** |

1      Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     Plaintiff brings this action under Sections 5(a)(1), 5(m)(1)(A), 13(b), 16(a), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105, to obtain monetary civil penalties, a permanent injunction, and other equitable relief for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), as amended, 16 C.F.R. Part 310.

2.     Defendants, Viceroy Media Solutions, LLC ("Viceroy"), Voltron Interactive, LLC ("Voltron"), Sunil Kanda ("Kanda"), and Quynh Tran ("Tran"), have operated a "consent farm" enterprise, using websites to deceptively collect and aggregate "leads" consisting of consumers' personal information and purported consent to receive telemarketing robocalls. In turn, Defendants sold these leads to telemarketing clients, who relied on consumers' purported consent to justify robocalling consumers. Defendants' "consent farm" business is unlawful. Defendants' websites are misleading because they failed to clearly disclose that consumers were consenting to receive robocalls, instead leading consumers to believe that they were providing their personal information in order to access job posting. Moreover, under the TSR, the seller itself must obtain consent to robocall—not an unrelated third-party. Therefore, Plaintiff files this lawsuit to recover civil penalties and halt Defendants' deceptive acts and practices.

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, as well as 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 56(a), because this case involves claims arising under federal laws regulating commerce and is commenced by the United States.

4.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1395(a), as well as 15 U.S.C. § 53(b)(2), because Defendants transact business in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

5.     Assignment to the San Francisco or Oakland Division is proper pursuant to Local Rule 3-2(d) because Defendants sold the personal information of numerous consumers in San

Francisco and throughout the Bay Area.

**DEFENDANTS**

6. Defendant Viceroy, is a California limited liability company with its principal place of business at 2372 Morse Avenue #306, Irvine, California 92614. Viceroy owns the internet domains quick-jobs.com and localjobsindex.com. Viceroy transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Viceroy acquired information from consumers throughout the United States and then advertised, marketed, distributed, or sold that information to third parties throughout the United States.

7. Defendant Voltron is a Delaware limited liability company with its principal place of business at 2252 Chambers Road, Suite 100, Tustin, California 92780. Voltron operates and controls the internet domains quick-jobs.com and localjobsindex.com. Voltron transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Voltron acquired information from consumers throughout the United States and then advertised, marketed, distributed, or sold that information to third parties throughout the United States.

8. Defendant Kanda is the founder of and an active participant at Voltron. Kanda holds a 50 percent ownership interest in both Viceroy and Voltron. He is responsible for operations at Voltron, and he has signed contracts on behalf of Voltron. At times relevant to this Complaint, acting alone or in concert with others, Kanda has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Kanda helped design and develop Voltron's lead generation database and is familiar with the consumer facing websites responsible for the leads generated by quick-jobs.com and localjobsindex.com. Kanda, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

9. Defendant Tran is an employee and managing member of Voltron, signing contracts on behalf of Voltron. Tran holds a 50 percent ownership interest in both Viceroy and Voltron and has personal knowledge of the functionality and content of quick-jobs.com and

localjobsindex.com. At times relevant to this Complaint, acting alone or in concert with others, Tran has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Tran, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

10.     Defendants Viceroy and Voltron (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the unlawful practices alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies with common ownership, business functions, employees, and office locations. Corporate Defendants operate as sister companies: Viceroy owns the quick-jobs.com and localindexjob.com domains while Voltron operates the websites.

11.     Both Corporate Defendants have the same owners, Kanda and Tran, with no other employees. In an email dated August 12, 2019, Tran explained: "Viceroy is our sister company – same owners. Voltron does all the marketing and lead generation, but the [web]sites are registered under Viceroy." Because Corporate Defendants have operated as a common enterprise, each entity is liable for the acts and practices as alleged in this Complaint.

## COMMERCE

12.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE FEDERAL TRADE COMMISSION ACT

13.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

14.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## THE TELEMARKETING SALES RULE

15.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-08. The FTC

adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. *See* 16 C.F.R. Part 310.

16. Under the TSR, an "outbound telephone call" is a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. *Id.* § 310.2(x). A "seller" is any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration. *Id.* § 310.2(dd). A "telemarketer" is any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. *Id.* § 310.2(ff).

17. As amended, effective September 1, 2009, the TSR prohibits initiating any outbound telephone call that delivers a prerecorded message ("robocall") to induce the purchase of any good or service, unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller. *Id.* § 310.4(b)(l)(v). The express agreement the seller has obtained from the recipient must include: (i) a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person; (ii) evidence that the seller obtained agreement without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service; (iii) evidence of the willingness of the recipient to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and (iv) the recipient's telephone number and signature. *Id.* § 310.4(b)(l)(v)(A).

18. Certain sections of the TSR apply to individuals or companies other than "sellers" or "telemarketers" if these individuals or companies provide substantial assistance or support to sellers or telemarketers. Pertinent here, it is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Sections 310.3(a), (c) or (d), or 310.4 of the TSR. *Id.* § 310.3(b).

19. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), a violation of the TSR is treated as a violation of an FTC rule under Section 18 of the FTC Act,

1  15 U.S.C. § 57a, regarding unfair or deceptive acts or practices. In turn, under Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## DEFENDANTS' UNLAWFUL CONDUCT

20. Defendants have operated as lead generators by collecting, aggregating, and selling consumers' personal information for profit. More specifically, Defendants have operated a "consent farm," bundling as leads consumers' personal information and their purported consent to receive telemarketing solicitations, including robocalls. Intermediaries, sellers, and telemarketers have purchased Defendants' leads and cite this purported consent to justify robocalling consumers.

21. Defendants generate their leads by operating websites that induce or are likely to induce consumers to disclose their personal information for the primary purpose of accessing local job listings. Defendants have sold the data they gather to numerous "partners" or "clients." Between August 2018 and September 2021, Defendants sold at least 46,562,557 leads to 37 clients, which generated $3,875,758 in revenue for Defendants. Upon information and belief, these leads resulted in tens of millions of robocalls to consumers across the United States.

### Misleading Collection Of Consumers Information

22. Since at least January 8, 2013, Defendants have owned, operated, and controlled the domains and websites quick-jobs.com and localjobsindex.com (collectively, "Defendants' websites"). Upon information and belief, these websites functioned in a similar fashion at times relevant to this Complaint. Defendants have used their websites to collect consumers' personal information, as well as their purported consent to receive robocalls.

23. As described below, Defendants' websites have purported to help consumers find job opportunities by presenting customized aggregated third-party employment listings. At the same time, consumers are misled or are likely to be misled by these websites into providing their personal information because it appears that this information is required and necessary to review job search results.

24. When consumers visit Defendants' websites, they are met with landing pages

1  with slogans such as "Apply Today. Start Tomorrow" and "Your Career Starts Here." These
2  landing pages prompt consumers to enter a job title and zip code. *See* Attach. 1 at 1-2.
3      25.    After entering that information and clicking a large, blue "Search Jobs >"
4  button, consumers are presented with a pop-up window that serves as a registration page. The
5  pop-up window alerts consumers in bold, black and red text that there are jobs available
6  nearby. Consumers are directed to "Enter Your Contact Info Below," and they are provided
7  with four fields to enter their first name, last name, email address, and telephone number.
8  Below those fields, consumers are prompted to check a box to "Receive Daily Job Updates by
9  email – Confirm the request to get started!" *Id.* Finally, there is a large, blue "CONTINUE >"



1  button. *See id.* at 3 (reproduced below).

2  26.  Each of the information fields is designated with bold, blue identifying text and a red asterisk next to it, a symbol that is commonly used on websites to designate a required field, or one that must be completed to move to the next screen. *Id.* The design of the pop-up window thus makes it appear as though registering and completing the fields is the only way to view available jobs. Indeed, an error message appears if a consumer hits the blue "CONTINUE >" button without completing the fields. *Id.* at 4.

27.  In between the information fields and the large "CONTINUE" button, there is a block of plain gray text, which is significantly smaller than both the information fields and the "CONTINUE >" button. At the end of that text, there is a blue "Skip Here" hyperlink. *Id.* at 3.

28.  Additionally, well-below the large "CONTINUE >" button, there is a small, gray line of text on a white background that states "Continue to Results >" *Id.*

29.  The functionality of the pop-up window permits a consumer to continue to the search results without entering their information only if they locate and click either of the following inconspicuous links: (1) the small, light blue "Skip Here" hyperlink at the bottom of the block of text, or (2) the "Continue to Results >" link found at the very bottom of the pop-up window.

30.  If a consumer enters their information in the designated fields and clicks the large "CONTINUE >" button, a second pop-up appears. This pop-up asks the consumer to answer three additional dropdown questions about their desired type of job (i.e., full time, part time, work from home, temporary, or seasonal), high school graduation year, and whether the job seeker would like to further their education (i.e., yes, maybe, probably within 6 months, or no). Each of these questions is also designated with a red asterisk. Moreover, as with the first pop-up, there is another large, blue "Agree & Continue >>" button. *Id.* at 5.

31.  Like the first pop-up, the second pop-up contains a "Skip Here" hyperlink at the bottom of a block of small text, as well as a "Continue to Results >" link at very bottom of pop-up window. To advance to the list of jobs, consumers can either click the "Agree & Continue >>" button, or, if they are able to, find and click on the inconspicuous "Skip Here" or "Continue to Results >" buttons.

**Misleading Collection Of Purported Consent**

32. While gathering consumers' personal information, Defendants simultaneously obtain their purported "opt in" or "consent to be contacted" by numerous telemarketers, including through robocalls. As set forth below, Defendants utilized design elements known as dark patterns, which interfere with consumers' ability to make informed choices about the use of their data and their willingness to receive robocalls and other solicitations.

33. As noted above, on the first pop-up, in between the information fields and the large "CONTINUE" button, there is a block of plain text, which is significantly smaller than both the information fields and the "CONTINUE" button. That text states in relevant part:

> By clicking the button, . . . I agree to this site's <u>terms</u> and <u>privacy policy</u>. I also agree to be contacted by QuickJobs, Fuentes, NewJobConnections, or its <u>partners</u> regarding career alerts or other opportunities via text, phone, email, artificial voice messages with an automated telephone dialing system and prerecorded messages.

*Id.* at 3.

34. Each of the underlined words in the block of text provides additional information that is not visible without clicking on or hovering the mouse pointer over the underlined word. The underlined words "terms" and "privacy policy" in the block of text are hyperlinks to Defendants' Terms and Conditions and Privacy Policy webpages. Consumers may access these webpages by clicking on the word or phrase and opening a hyperlink.

35. Of note, the Privacy Policy webpage states that the consumer agrees to waive all rights and privileges under the TSR:

> *Telemarking*. Company may use Personally Identifiable Information to advertise, directly or indirectly, to individuals using direct mail marketing or telemarketing using telephones and cell phones. . . . By registering on this site and checking the box to give your consent to be called, you are waiving your rights and privileges under these laws and expressly giving permission of Company and any agent of Company the right to contact you by telephone or cell phone, and you agree that

such act constitutes an inquiry and/or application for purposes of the Amended Telemarketing Sales Rule (16 CFR 310 et seq.), as amended from time to time[.]

36. The underlined word "partners" in the first pop-up is a hover box that appears on top of the block text when the consumer hovers with their the mouse over the term. This hover box contains a list of entities from whom consumers purportedly "agree to be contacted." That list of "partners" has at times contained at least 90 "partners" who could contact consumers. *See id.* at 6 (reproduced below):

> Career Placement Advisors, Career Finder Network, Career Resource Center, Rocket Jobs, Nexxt, Infinity One, MyJobHunter, My Job Group, Home Protectors, Educa, Iberdrola, American Disability Helpline, United States Disability, Email Magic LLC, Home Support Group, Heard and Smith, Premier Disability, Advocacy Center, Consumer Counsil, Medical Support Group, Home Support Group, Advocator Group, Citizens Disability, Miami Media, Insurance Proz, royal sea cruises, Gerber Life Insurance, Blogly, Transparent Truth, DMS, SOS Team, National Disability, Disability Advisor, AiMediaOne, Help Advisors, Debt Help Express, SMG, Follow My Lead, Job Funnel, Insurance Guide, Complete Home Services, American Police Officers Alliance, Fit Funnel, FindCredit, EZLiving, Eigo, Nordic, Indra, Park Power, RPA Energy, Titan, Tomorrow Energy, WGL, Town Square, Residents Engery, IDT, Citycom Solar, WMG, Direct Energy, CleanSky Engery, Solar Simplified LLC, Insurance Guide, Complete Home Services, 21st Century, Allstate, All Web Leads, American Family, Amica, Charity Guide, Farm Bureau, Farmers, LCN, Liberty Mutual, MAPFRE, Nationwide, Plymouth Rock, Progressive, Safeco, Select Quote, Solid Quote, State Farm, The General, The Hartford, The Lead Company, Travelers, Tri-State Consumer Insurance, USAA, National Debt Helpers, Senior Aid Helper, JobsFunnel, Career Helper, Arcamax, Career Guide.

37. Similarly, on the second pop-up, when a consumer answers the dropdown question "Are you interested in furthering your education?" with either "yes," "maybe," or "probably within 6 months," another block of small text appears above the blue "Agree & Continue >>" button. That text provides in relevant part:

> By selecting yes/maybe/probably and clicking "Agree and continue", I consent to be contacted by email, text, and phone regarding educational opportunities at the phone number provided . . . using an automated telephone dialing system, pre recorded messages. I may be contacted by [list of entities] . . . I also agree to this site's terms and privacy policy.

*Id.* at 5.

38. The block of small text has at times identified a list of at least 55 entities by whom consumers "may be contacted." Some of those entities do not appear to pertain to educational opportunities, including "Mac Connect," "iCore Support," and "J2Media Ventures." *Id.*

39. As designed, Defendants' websites are likely to prevent consumers from making

informed choices about whether they wish to receive robocalls and other solicitations. Among other things, Defendants' websites do not clearly disclose to consumers that they are consenting to receive robocalls and other telemarketing solicitations because they:

   a.   Conceal the identity of their marketing "partners" within a hover box, meaning the text is not visible without hovering the mouse pointer over a specific term, which is in some cases virtually indistinguishable from surrounding text;

   b.   List up to 90 such marketing "partners" in a hover box;

   c.   Use buttons labeled with terms such as "confirm" and "continue" that do not put consumers on notice of the legal significance of the actions they are taking;

   d.   Present disclosures in blocks of small, gray text against a white background;

   e.   Use disclosures that are disproportionately small compared to more prominent, often contradictory, messages and other distractions on the same page; and

   f.   Obtain consent through hyperlinks to other webpages.

### Defendants' Sales Of Consumer Leads

40. When consumers provided their information and purported consent to receive telemarketing, Defendants' websites populated an electronic database with this information. The database also contemporaneously recorded and saved the date and time when consumers clicked the blue "CONTINUE" button, and it assigned each consumer a universal unique identifier.

41. When consumers accessed one of Defendants' websites, Defendants also had access to the consumer's contemporaneous use and input of data. Defendants have sold that input to a variety of partners. The lead generation information collected and subsequently sold by Defendants included a consumer's: first name; last name; IP address; email address; phone number; city; state; zip code; high school graduation year; and the date the consumer accessed or registered on the Quick-Jobs Website.

42. Defendants have sold consumers' personal information for prices ranging between $0.05-$0.55 per lead, with as many as 10,000 leads available for purchase every day. Defendants have sold these leads to numerous clients, who negotiate the terms of the volume, cost, and frequency of receiving leads. Defendants have sold both aged leads (leads based on past consumer

activity) and live or real-time leads (leads that are available contemporaneously with the consumer's activity). The cost of live or real-time leads is significantly higher than aged leads.

43. Some of Defendants' clients are intermediaries for the actual sellers of goods and services. Defendants' clients—or its clients' clients—inundate consumers with outbound telephone calls (including robocalls), text messages, and email solicitations relating to a multitude of products and services. Based on the "partners" identified on Defendants' websites, it appears that customers receive solicitations regarding life insurance ("Gerber Life Insurance"), cruises and travel ("royal sea cruises"), and disability insurance ("National Disability," "Citizens Disability," and "Disability Advisor"), among others. *Id.* at 6.

### Defendants Are Not Sellers As Contemplated By The TSR

44. Defendants' websites do not evidence the willingness of the consumer to receive calls delivering prerecorded messages "by or on behalf of *a specific seller*," as required by the TSR, 16 C.F.R. § 310.4(v)(A)(iii) (emphasis added), given the lists of numerous and varied entities presented on the websites.

45. Further, Defendants are not a "seller," or legal agents of a "seller," as defined by the TSR, 16 C.F.R. § 310.2(dd), so their websites cannot meet the TSR's requirement that, for calls delivering prerecorded messages, "the *seller* has obtained *from the recipient of the call* an express agreement, in writing" to receive the call, 16 C.F.R. § 310.4(v)(A) (emphasis added). As it pertains to consent to receive calls delivering prerecorded messages, the TSR simply does not allow Defendants' "consent farm" business model.

### Defendants Assisted In Unlawful Telemarketing

41. Defendants have sold leads to clients that initiated, or transferred leads to other entities that initiated, outbound telemarketing solicitations, including robocalls.

42. Defendants' clients include call centers that contract with other companies selling goods and services for which consumers have not given express consent to receive robocalls. For example, one of Defendants' call center clients, Yodel Technologies, LLC ("Yodel"), is not listed as a specific seller or "partner" on Defendants' websites. Even so, based on information and belief, Yodel made over 14 million calls to consumers based on the purported consent obtained from

1 Defendants' websites.

2  43. Additionally, many of Defendants' clients do business under multiple names ("DBAs"), which appear to further shield from the consumer the identify of the seller that may deliver a robocall to the consumer. For example, Defendants' client Digital Media Solutions, LLC ("DMS") is associated with over twenty DBAs, including "DMS," "Citizens Disability," "American Disability Helpline," "Gerber Life Insurance," and "SOS Team, only some of which are listed as "partners" in the first pop-up on Defendants' websites.."

44. Defendants knew or consciously avoided knowing that the leads they sold resulted in telemarketing, including robocalls. As set forth below, some of Defendants' client contracts specifically included provisions stating that leads would be used for prerecorded telemarketing calls. Likewise, Defendants' websites specifically state that a consumer is purportedly consenting to receive artificial voice messages with an automated telephone dialing system, and prerecorded messages. Defendants also knew or consciously avoided knowing that their clients and their clients' clients did not have a pre-existing business relationship with the consumers they called and would be relying on the purported "consents" Defendants sold to them to make robocalls.

<u>Yodel Technologies, LLC</u>

45. Yodel has provided various telemarketing services to clients, including operating as a call center, a Voice Over Internet Protocol servicer, and data sales marketer.

46. On December 30, 2019, Defendants entered into a Compliance Addendum regarding Yodel's Telemarketing Business. In that Addendum, Defendants "confirm[ed] that [they] will use generate [*sic*] leads in a compliant manner in its fulfillment of its Agreement with YODEL." The term "compliance" was defined as the "appropriate method of lead generation, performed in conjunction with all applicable State and Federal laws governing the activities." Defendants also "confirm[ed] that [they were] aware of and agree[d] to abide by all applicable telemarketing laws and regulations at the Federal, State, and local levels. Among others these shall include . . . the Telemarketing Sales Rule ("TSR") which is administered by the Federal Trade Commission." Lastly, the Addendum defined "Telemarketing" as "contacting and or communicating with consumers by telephone for a marketing purpose. This shall include telephone

calls to any telephone line, including but not limited to landlines, Voice Over Internet Protocol lines, and wireless numbers. In addition, texting and delivering ringless voicemails shall likewise be considered telemarketing." Taken together, these provisions illustrate Defendants' knowledge of the TSR and that Yodel would use leads for telemarketing.

47. In an email sent to Kanda in July 2019, a Yodel employee noted that the parties were addressing the "growing concern for many clients buying any website opt-in data. . . . You as the data provider, us as the call center, and the end clients working with the call transfer they take." This email demonstrates that Defendants knew Yodel was making telemarketing calls on behalf of others, using Defendants' leads as a basis for doing so.

48. In 2018, Kanda also received an email from a Yodel employee stating "… so we don't have enough data from you to generate enough calls to keep up to 5 Yodel agents busy. If we knew your expected data volumes or if you had a back log of data for us to load that may get us off the ground." Kanda replied to this email: "We're growing pretty fast and should be able to get to 15k within a month or two. We do have a back log of data we can pull to get started. Is there a way to do a few agents then?" After a few more exchanges in this email chain, Kanda sent Yodel an email attaching a .csv data file containing a list of first names, last names, IP addresses, email addresses, phone numbers, cities, states, zip codes, and created dates, for 275,033 consumers. The fact that Defendants provided hundreds of thousands of leads for a handful of call center agents demonstrates Defendant's knowledge that Yodel agents were making telemarketing robocalls.

49. Between August 2018 and August 2021, Yodel purchased 4,040,511 leads from Defendants. Based on information and belief, between January 2018 and May 2021, Yodel made over 14 million telemarketing calls to consumers based on the invalid consent a consumer gave on Defendants' websites, all or almost all of which are believed to be robocalls.

Digital Media Solutions, LLC

50. DMS makes outbound telephone calls and uses Yodel's Business Process Outsourcing Call Center to power DMS's performance-based call center campaigns. DMS previously used Yodel's dialer technology and agents to connect consumers to DMS clients.

51. Defendants' contract with DMS for "DMS Edu," which was signed by Tran, states:

"consumer data records . . . shall consist of individuals that have provided 'prior express written consent' to receive commercial telephone calls, including prerecorded messages, robocalls and/or autodialed via automated technology, to the telephone number(s) (including wireless number(s)) provided to [Defendants] or any Sub-Publishers or other third party that provide data to [DMS]." This contract illustrates Defendants' knowledge that DMS would engage in robocalling.

52. In 2018, Defendants knew that a consumer complained about receiving an outbound telemarketing call from DMS's client, Citizens Disability—one of the DBAs on the registration pop-up window—based on the purported consent the consumer gave on quick-jobs.com. Specifically, in July 2018, Tran received an email from a client, Lead Pulse Media, stating that they had "received a high level complaint on the Citizens Disability offer…can you give us the specific url where the leads was generated?"

53. On August 30, 2018, Tran signed an affidavit, confirming the same consumer visited quick-jobs.com on May 17, 2018. Tran further confirmed that the consumer provided their name, age, email, and telephone number on quick-jobs.com.

54. Between January 2019 and March 2022, DMS purchased 6,746,739 leads and data from Defendants and used those leads and data for outbound marketing campaigns. On information and belief, Yodel made over 10 million telemarketing calls to consumers based on the invalid consent obtained on Defendants' websites on behalf of DMS, all or almost all of which are believed to be robocalls.

<u>Target Marketing And Education Dynamics</u>

55. Defendants entered into a "Data Purchase Agreement" with Target Marketing on September 12, 2019. In this contract, Defendants agreed to send consumer information to Target Marketing for its "education marketing program, which expressly includes outbound dialing and SMS text messages, without limitation ('campaigns'). Each Record shall include evidence that the appropriate prior express written consent ('consent') was given by the consumer." With respect to the consumers' data, Defendants were "solely responsible for compliance with any and all applicable laws… including … applicable laws, rules, regulations, court orders, and administrative decisions of… Federal Trade Commission (FTC) … and FTC Telemarketing Sales Rule (TSR)."

56. In a July 2020 email, Kanda was made aware that Defendants' client, Education Dynamics, engaged in prerecorded telemarketing based on the leads sold by quick-jobs.com.

57. An Education Dynamics employee notified Kanda that changes to the disclosure language on the registration pop-up needed to be made. Among other things, the employee requested that the disclosure be updated to show that consumers consented to be contacted regarding career alerts "or other opportunities" via "prerecorded messages." Within a few days, Kanda sent a screenshot showing that the changes were made. This again illustrates that Defendants knew their clients were initiating robocalls.

58. Defendants sold 2,989,916 consumer leads to Target Marketing between August 2018 and August 2021. On information and belief, Yodel made over 7,000 telemarketing calls to consumers based on the purported consent a consumer gave on Defendants' websites on behalf of Target Marketing, all or almost of which are believed to be robocalls.

Lead Off Marketing Group

59. In or around March 2020, Defendants entered into a "Publisher Insertion Order" with Lead Off Marketing Group ("Lead Off") for the purchase of consumer leads. Defendants sold 207,068 consumer leads to Lead Off between March 2020 and August 2021.

60. In or around October 2020, Kanda received an email from a Lead Off employee requesting certain DBAs be included in the "partners" list and certain DBAs be removed. That employee requested that Indra Energy be listed among the DBAs.

61. In March 2021, Defendants knew a consumer complained about receiving an outbound telemarketing call from Indra Energy based on the invalid consent the consumer gave on quick-jobs.com. In response to this consumer complaint, Kanda signed an affidavit confirming the complainant visited quick-jobs.com on December 5, 2020. Kanda further confirmed the consumer provided their name, mailing address, email, and telephone number on quick-jobs.com, and that multiple "partners" had the consumer's personal information.

**Ongoing Conduct**

62. Based on the facts and violations of law alleged in this Complaint, Plaintiff has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC

because, among other things: Defendants have a long history of continuous conduct of the type described above; Defendants remain in the lead generation business and continue to gather consumer information using deceptive and unlawful practices; and Defendants maintain the means, ability, and incentive to engage in similar conduct in the future.

## COUNT I

### Assisting And Facilitating Violations Of The Telemarketing Sales Rule

63. In connection with the generation and sale of leads to third parties, as described in above, Defendants have provided substantial assistance or support to "sellers" or "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2.

64. In numerous instances, in connection with telemarketing, those sellers and/or telemarketers to whom Defendants have provided substantial assistance or support have initiated or caused the initiation of outbound telephone calls that delivered prerecorded messages to induce the sale of goods or services, in violation of 16 C.F.R. § 310.4(b)(1)(v).

65. At all relevant times, Defendants knew or consciously avoided knowing that the sellers and/or telemarketers to whom they provided substantial assistance or support were making the unlawful calls described in Paragraphs 41-61, which violated § 310.4(b)(1)(v) of the TSR.

66. Defendants' substantial assistance or support, as alleged in Paragraphs 63-65, violates the TSR, 16 C.F.R. § 310.3(b).

67. Defendants' violations of the TSR were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## COUNT II

### Misrepresentations In Violation Of The Federal Trade Commission Act

68. In numerous instances, in connection with generating leads for sale to third parties, Defendants have represented, directly or indirectly, expressly or by implication, that they are collecting consumers' personal information, including their phone number and email address, for the primary purpose of providing local job listings.

69. In truth and in fact, in numerous instances in which Defendants make the representation as set forth in Paragraph 68 of this Complaint, Defendants are not collecting

consumers' personal information for the primary purpose of providing local job listings, but for the purpose of selling this information to third parties as leads.

70. Therefore, Defendants' representations as set forth in Paragraph 68 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

72. Consumers in the United States have suffered and will continue to suffer injury as a result of Defendants' violations of the FTC Act, the Telemarketing Act, and the TSR. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

73. Section 13(b) of the FTC Act, U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt violations of any provision of law enforced by the FTC, including the FTC Act, the Telemarketing Act, and the TSR.

74. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74 § 701, 129 Stat. 599 (2015), and Section 1.98(d) of the FTC's Rules of Practice, 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties for each violation of the TSR committed with actual knowledge or knowledge fairly implied.

75. Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), and Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting Defendants' violations, or unfair or deceptive acts or practices.

# PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A. Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this Complaint;

B. Enter a permanent injunction to prevent future violations of the FTC Act, the Telemarketing Act, and the TSR by Defendants;

C. Award Plaintiff monetary civil penalties from each Defendant for every violation of the Telemarketing Act and the TSR;

D. Grant preliminary injunctive and ancillary relief; and

E. Award any additional relief the Court may determine to be just and proper.

Dated: July 14, 2023

*Of Counsel:*

DENISE M. OKI
Western Region San Francisco
Federal Trade Commission
90 7th Street, Suite 14-300
San Francisco CA  94103
Tel: (415) 848-5100

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA:

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director
Consumer Protection Branch

RACHAEL L. DOUD
Assistant Director
Consumer Protection Branch

ZACHARY L. COWAN
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
450 5th Street, N.W.
Washington, D.C. 20530
Tel: 202-353-7728
Fax: 202-514-8742
Zachary.L.Cowan@usdoj.gov


ISMAIL J. RAMSEY
United States Attorney

MICHELLE LO
Chief, Civil Division

  /s/ Kenneth W. Brakebill
KENNETH W. BRAKEBILL
Assistant United States Attorney
Northern District of California
450 Golden Gate Avenue
San Francisco, California 94102
Telephone: (415) 436-7167
Kenneth.Brakebill@usdoj.gov